Filed 7/15/24  In re D.M. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re D.M., a Person Coming Under the Juvenile Court Law. | B334166 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>P.J., JR.<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 22LJJP00291 |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

Father P.J., Jr., appeals from the juvenile court's order terminating his parental rights. P.J. contends the court erred in declining to consider placing his son D.M. with paternal grandmother under the relative placement preference set forth in section 361.3 of the Welfare and Institutions Code.[1] The Los Angeles County Department of Children and Family Services (DCFS) contends P.J. has no standing to appeal from the court's order and, alternatively, the court correctly found section 361.3 did not apply. We agree and affirm the court's order in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

D.M. was born in July 2022. At the hospital, D.M.'s mother reported she had used methamphetamine during her pregnancy, although her and D.M.'s. toxicology screenings were negative. DCFS was contacted. Mother told DCFS that P.J. was the baby's father. They had split up after the first few months of her pregnancy. Mother also completed a parentage questionnaire stating she believed P.J. was D.M.'s father, he had held himself out as the father, but he was not present for the birth and had not signed the birth certificate.[2] Mother said she had no contact with P.J., but she had learned he recently had been arrested. P.J. had a violent criminal history from 2012 to 2022.

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] Mother, who is not a party to this appeal, was legally married to, but separated from, another man (E.C.) when D.M. was conceived. E.C. said he was not D.M.'s father. The court ultimately found E.C. was "no type of father to D.M."

A DCFS social worker first met with P.J. at the sheriff's station, where he was in custody. He confirmed he had not seen the baby and had been present only during the beginning of mother's pregnancy.[3] In a telephone call a few days later, P.J. said he could not care for D.M. "at the moment" due to financial instability. He "provided possible placement for the child." (The detention report does not state whom P.J. identified, but the social worker unsuccessfully attempted to contact paternal grandmother the same day.)

DCFS obtained court authorization to remove D.M. from parents. On July 15, 2022, DCFS filed a section 300 petition on behalf of D.M. based on mother's substance abuse, P.J.'s domestic violence incident with the mother of D.M.'s paternal half-sibling C.J., and P.J.'s inability to care for D.M. A month later, on August 16, 2022, DCFS filed a first amended petition adding allegations of P.J.'s substance abuse.

At the July 18, 2022 detention hearing, the juvenile court found P.J. to be D.M.'s alleged father. P.J. did not appear. The court removed D.M. from parents' custody. D.M. was placed with foster caregiver Ms. C.

DCFS spoke with paternal grandfather and paternal aunt Vanessa on August 4, 2022. They confirmed P.J. was in jail. Paternal grandfather said he could not "care for [D.M.] financially," but he wanted to have a relationship with

---

[3] P.J. had been in a relationship with the mother of his other child C.J. He had been involved in a domestic violence incident with her in January. On July 29, 2022, C.J.'s mother obtained sole custody of C.J. and a temporary restraining order against P.J. A criminal protective order also was issued.

"his grandchild."  Aunt Vanessa also could not provide a home for D.M. but said she and paternal family could offer support through other means, such as childcare and transportation. They wanted to have a relationship with D.M.

A week later, on August 11, 2022, a social worker again spoke with P.J.  He clarified he " 'want[ed] to be a father' " to D.M., but currently could not care for him due to his incarceration.  P.J. told the social worker he had spoken to paternal relatives, and they had agreed to care for D.M. while he was incarcerated.  He asked that paternal aunt Vanessa be considered for relative placement.  On August 17, 2022, P.J. pleaded guilty to assault with a deadly weapon.  He later was sentenced to four years in state prison.

The juvenile court arraigned P.J. on August 24, 2022. He filed a statement of parentage that same day stating he believed he was D.M.'s parent and asking the court to make a presumed father finding.  P.J. also identified paternal aunts Valerie, Vanessa, and L.J., as well as paternal grandmother, as possible relative placements in his relative information sheet. The court deferred its paternity finding.  It ordered a pretrial release investigation of paternal relatives.

DCFS filed its pretrial release investigation report on September 6, 2022.  On August 31, 2022, DCFS met with paternal relatives and assessed their home for D.M.'s placement.[4] Paternal grandmother, paternal grandfather, paternal aunt

---

[4]    DCFS assessed paternal aunt L.J.'s home on August 26, 2022.  She did not have room for D.M. in her home but could help paternal family with childcare.

4

Vanessa and her two children, and paternal aunt Valerie shared the home. Paternal grandmother and aunts wanted to provide a home for D.M. They would care for D.M. as a family, with help from aunt L.J. They had never met D.M. and asked for visitation. DCFS could not recommend D.M. be placed with paternal relatives at that time, however. Paternal grandfather, who lived in the home, had a criminal record—dating back to 2012 and earlier in 1992, 1994, and 1997—requiring further review by the RFA (resource family approval) division. DCFS gave paternal grandmother, Vanessa, and Valerie an RFA application to have the home reviewed further.

Paternal grandmother turned in the RFA application about two weeks later, on September 16, 2022. She told the social worker she and the other paternal relatives "still very much want[ed] to start visitation" with D.M. DCFS submitted the application for processing on September 19, 2022, and asked the court to order visitation between D.M. and paternal relatives.

On October 20, 2022, the court sustained the amended section 300 petition as to P.J.'s domestic violence issues and his and mother's substance abuse issues under section 300, subdivisions (b)(1) and (j). The court convened the disposition hearing a month later, on November 21, 2022. P.J. was not present—he was in the process of being transferred to state prison. The court declared D.M. a dependent of the juvenile court, removed him from parental custody, bypassed family reunification services as to mother (due to her failure to reunify with her older children), bypassed reunification services for P.J. based on his status as an alleged father and four-year period of incarceration (§ 361.5, subds. (a), (e)), and set a section 366.26 permanency planning hearing for March 21, 2023. The court

5

found D.M.'s current placement appropriate. After the court made its findings, P.J.'s counsel relayed his client's request for a paternity test. The court stated it would order the DNA test once P.J.'s place of incarceration was determined—a necessity for the order.

On December 23, 2022, P.J.'s counsel walked on the proposed DNA testing order with P.J.'s place of incarceration. The court issued the order on January 3, 2023. On February 23, 2023, the Department informed the court that D.M.'s DNA sample had been collected in January, but P.J.'s had not, as he had been transferred to a new facility. The testing lab required a new court order, which the court issued on February 27, 2023.

The taking of P.J.'s DNA sample continued to be delayed due to his transfers to different facilities—requiring the court to issue a new order each time—and a backlog in sample collections within the prison system. Pending receipt of the DNA results, the court continued the March 21, 2023 section 366.26 hearing several times—to June, August, October, and, finally, December 2023.

In the meantime, as reported in the permanency planning adoption assessment, paternal relatives had withdrawn their RFA application as of January 27, 2023. On that day, paternal aunt Valerie told the social worker, " 'We can't take on a full commitment with someone else[']s child until they are 18 years old. So we withdrew the application until we find out [if D.M.] is my brother's.' " The report noted Ms. C. wanted to adopt D.M. if he was not placed with paternal relatives. She had been caring for D.M. since he left the hospital after his birth—she loved him and saw " 'him as [her] own.' " DCFS recommended adoption by Ms. C. as D.M.'s permanent plan.

In its May 2023 status review report, DCFS noted paternal relatives were visiting D.M. bi-weekly for two hours, "while they navigate if they would like to be considered for permanency for [D.M.]." They did not want to move forward with the RFA process until they were sure of D.M.'s paternity. After two monitored visits in February 2023 and one in early March went well, DCFS liberalized paternal relatives' visits to unmonitored. It also offered paternal relatives additional visitation hours, but the family declined.

On May 22, 2023, the court identified adoption as D.M.'s permanent plan and found his placement continued to be appropriate.

Paternal relatives stopped visiting D.M. after his first birthday in July 2023. Ms. C. told DCFS in September, and again in October, that she had not heard from paternal relatives since that July visit. In November 2023, DCFS reported that D.M. and Ms. C. appeared to be bonded with each other. D.M. called Ms. C. " 'mama,' " and he turned to her for support. Ms. C. was committed to adopting D.M.

On November 6, 2023, DCFS finally received the paternity test results from the testing facility. They showed P.J. was D.M.'s biological father. On November 28, 2023, P.J. appeared in court virtually from his facility. The court found him to be D.M.'s biological father based on the testing results. P.J. asked to be present in person for future hearings. As state prison facilities were not honoring in-person court attendance by inmates, the court ordered P.J. to be made available to appear at the December 14, 2023 section 366.26 hearing by WebEx (video) or phone from his place of incarceration.

The court convened the section 366.26 hearing on December 14, 2023.  P.J. was not present.  The court denied P.J.'s counsel's request for a continuance.  The court noted P.J. had appeared by phone from his facility at the last hearing and was told to call in that morning but had not.

Paternal grandmother, who was present, addressed the court first.  She explained the family had been awaiting the results of D.M.'s paternity test, which had been delayed until recently.  She wanted to care for D.M. now that it was certain he was P.J.'s child.  The court stated that the time to consider relative preference for placement "ha[d] passed."  The court explained P.J. had been denied the opportunity to reunify with D.M. on the same day he had asked for the paternity test. The court continued, "even as a biological father[,] he's not entitled to the [reunification] services that would have been ordered, so he and the mother were never given the opportunity [to reunify]."  P.J., therefore, "w[as] never on a path to reunify. It d[id]n't matter that he was bio or not."  Paternal grandmother thought that was unfair given the family had received the paternity test results only a few weeks earlier.  The court explained, "perhaps if you had expressed an interest on November 21st, 2022, you could have been considered.  But the fact that you are here now and we are at the hearing that we're at, there is no legal basis for [the court] to consider you." Paternal grandmother responded the family had been visiting D.M. and could not attend the hearing a year earlier because someone had objected and excluded them.

The court then heard argument on DCFS's recommendation to terminate parental rights.  Counsel for P.J. objected to the termination of parental rights and asked that

D.M. be placed with paternal grandmother. Counsel for DCFS noted P.J. had had no contact with D.M., and parental relatives had not asked consistently for the child's placement. Despite P.J. having said he was D.M.'s father "from the beginning," paternal relatives "wait[ed] and wait[ed] to make sure they were related." D.M. also was "doing very well" in the home of his caregiver who wanted to adopt him. Counsel for D.M. joined in the recommendation to terminate parental rights.

After considering argument and DCFS's reports, the court terminated parents' parental rights over D.M., selected adoption as his permanent plan, and designated Ms. C. as D.M.'s prospective adoptive parent. The court allowed visitation— at Ms. C.'s discretion—between D.M. and paternal relatives until the adoption was finalized. P.J. appealed from the order terminating parental rights and the order denying the child's placement with paternal grandmother.

## DISCUSSION

P.J. challenges the court's order terminating his parental rights solely on the ground the court erred in denying his request to place D.M. with paternal grandmother without applying the factors under the relative placement preference set forth in section 361.3. He asks us to reverse the order terminating parental rights and remand the matter for a section 361.3 hearing to consider placing D.M. with paternal grandmother before the court selects and implements a permanent plan for D.M. P.J. lacks standing on appeal to challenge the court's placement decision, and, in any event, section 361.3 does not apply.

9

1. ***P.J. lacks standing to challenge the placement order made at the hearing terminating his parental rights***

"Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal." (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).) An "aggrieved person" is one who has a legally cognizable interest that the court's decision has injuriously affected "in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*Ibid.*; see also *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 435 (*Isaiah S.*).) Thus, a party does not have standing "to urge errors on appeal that affect only the interests of others." (*In re A.K.* (2017) 12 Cal.App.5th 492, 499 (*A.K.*).)

The section 361.3 relative placement preference requires the court to give "preferential consideration" to a relative's request for placement of a dependent child who has been removed from a parent's custody. (§ 361.3, subd. (a).) " 'Preferential consideration' " means "that the relative seeking placement shall be the first placement to be considered and investigated." (*Id.*, subd. (c)(1).) "[T]he fact that a parent makes his or her wishes known to the court," however, "does not necessarily establish standing for the parent to challenge the court's ruling against the parent's wishes for relative placement." (*Isaiah S., supra*, 5 Cal.App.5th at p. 435.) Section 361.3 "protects a relative's 'separate interest' in a relationship with the child. [Citation.] In contrast, a parent's interest in a dependency proceeding is in *reunifying* with the child. [Citations.] The parental interest in reunification is distinguished from a relative's 'separate interest' in preferential placement

10

consideration or in having a relationship with the child. [Citation.]" (*A.K., supra*, 12 Cal.App.5th at p. 499.)

After reunification services are terminated or bypassed (as was the case here), however, " 'the parents' interest in the care, custody and companionship of the child [is] no longer paramount.  Rather, at this point, "the focus shifts to the needs of the child for permanency and stability." ' " (*K.C., supra*, 52 Cal.4th at p. 236.)  For this reason, a parent generally does not have standing to raise relative placement issues on appeal where the parent's reunification services have been terminated or bypassed.  (*A.K., supra*, 12 Cal.App.5th at p. 499.)

Nevertheless, our high court has held "[a] parent's appeal from a judgment terminating parental rights [can] confer[ ] standing to appeal an order concerning the dependent child's placement," but "only if the placement order's reversal advances the parent's argument against terminating parental rights." (*K.C., supra*, 52 Cal.4th at pp. 234–235, 238 [finding father who did not contest the termination of his parental rights in the juvenile court could not be aggrieved by the court's order denying grandparents' section 388 petition to have his child placed with them and thus had no standing to appeal the placement decision].)  This is because "[t]he placement of a dependent child with relatives can, under certain circumstances, make the termination of parental rights unnecessary." (*Id.* at p. 237.)  Specifically, under what is known as the relative caregiver exception, a juvenile court may choose not to terminate parental rights when "[t]he child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of

11

providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of their relative would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(A).)

In *K.C.*, however, our high court found the father had "no remaining, legally cognizable interest in [his child's] affairs, including his placement," where he did not argue below—or on appeal—that a statutory exception to termination of parental rights applied or contend the order terminating his parental rights "was improper in any respect." (*K.C., supra*, 52 Cal.4th at pp. 236–237.) P.J. contends that is not the case here, as he objected (through counsel) to the court's termination of his parental rights at the section 366.26 hearing and "maintained he wished to maintain a relationship with D.M." As in *K.C.*, however, P.J.'s counsel never argued a statutory exception to termination of his parental rights applied to support that objection. Nor did P.J. contest the court's finding that D.M. was adoptable, or its earlier orders identifying adoption as D.M.'s permanent plan and finding D.M.'s placement with Ms. C. was appropriate. He thus would seem to have "no remaining, legally cognizable interest in [D.M.'s] affairs." (*Id.* at p. 237.)

Nevertheless, relying on *In re H.G.* (2006) 146 Cal.App.4th 1 (*H.G.*), and *In re Esperanza C.* (2008) 165 Cal.App.4th 1042 (*Esperanza C.*), P.J. argues he has standing because, had D.M. been placed with paternal grandmother, he may have been able to advance the application of the relative caregiver exception against the termination of his parental rights—an argument he did not have absent that placement. The facts and procedural posture of those cases are distinguishable.

In *H.G.*, parents appealed from an order removing their child from her grandparents' custody under section 387— "without considering whether the child's placement was no longer appropriate in view of the criteria in section 361.3"—and the judgment terminating their parental rights. (*H.G.*, *supra*, 146 Cal.App.4th at pp. 4, 6–7.) There, had the child not been removed from her relative placement, the relative caregiver exception to adoption might have applied as the child had been living with her grandparents. As the court explained, "a placement decision under section 387 has the potential to alter the court's determination of the child's best interests and the appropriate permanency plan for that child, and thus may affect a parent's interest in his or her legal status with respect to the child." (*Id.* at p. 10.)

Relying on *H.G.*, the court in *Esperanza C.* held a mother had standing to challenge the juvenile court's denial of her section 388 petition that argued the child services agency had abused its discretion in rejecting a relative's placement application—after denying his request for a criminal records exemption—and asking the court to place the child with the relative. (*Esperanza C., supra*, 165 Cal.App.4th at pp. 1050–1051, 1053–1054.) The child, who had been placed in a prospective adoptive home, also appealed from the court's denial of her own section 388 petition seeking placement with the relative. (*Id.* at pp. 1049, 1051.) The juvenile court found the relative's conviction was "exemptible" but believed it had no jurisdiction to review the agency's denial of the exemption and summarily denied the petitions. (*Id.* at p. 1051.) The mother's parental rights were terminated. (*Id.* at p. 1052.) The reviewing court found the mother had standing to appeal because resolution

13

of the issue in favor of placing the child with the relative made an alternative permanency plan to adoption "a statutory option for the juvenile court." (*Id.* at p. 1054.)

As the *K.C.* court noted, in both these cases the parents had standing to challenge the placement orders because, unlike the father there, "the possibility existed that reversing those orders might lead the juvenile court not to terminate paternal rights." (*K.C., supra*, 52 Cal.4th at p. 237.) Similarly, no circumstances existed here at the time of the placement decision that would make application of the relative caregiver exception a realistic possibility.

In *H.G.,* the child already had been living with the grandparents and had developed a relationship with them—facts key to the application of the relative caretaker exception. (See § 366.26, subd.(c)(1)(A).) D.M., on the other hand, never was placed in paternal grandmother's care, nor does the record suggest he developed a bond with her during their bi-weekly visits. Moreover, the placement decision in *H.G.* concerned the child's *removal* from the relatives' home (*H.G., supra*, 146 Cal.App.4th at p. 10), not the removal of a child from the only home he had known so as to place him with a relative, as would be the case here.

And in *Esperanza C.*, the agency had applied the wrong standard in finding the relative's home was unsuitable for the child's placement. (*Esperanza C., supra*, 165 Cal.App.4th at pp. 1050, 1061.) Thus, there was a realistic possibility the relative's home would be approved if the correct standard were applied, which in turn could result in a change of placement and affect the court's determination as to the child's permanent plan. (*Id.* at p. 1054.) Critically, paternal relatives here *withdrew*

14

their RFA application, thereby removing paternal grandmother's home from consideration for D.M.'s placement. Paternal relatives wanted to be sure of D.M.'s paternity, but nothing in the record indicates paternal grandmother resubmitted the RFA application after receiving the paternity results. And, unlike the parent and child in *Esperanza C.*, neither P.J. nor paternal grandmother filed a section 388 petition asking the court to change D.M.'s placement. Rather, they waited until the section 366.26 hearing to ask the court to consider placing D.M. with paternal grandmother.

Moreover, in *Esperanza C.*, the child's counsel obviously agreed the child should be placed with the relative, having filed the section 388 petition and appeal on the child's behalf. D.M.'s counsel, on the other hand, joined in both DCFS's recommendation to terminate paternal rights, and its earlier recommendation to bypass P.J.'s reunification services due to his four-year term of incarceration. Finally, the relative and his wife in *Esperanza C.* had asked the agency to place the child with them from the beginning of the proceedings, filed a grievance with the agency when it denied their home evaluation, and even attempted to appeal from the juvenile court's orders. (*Esperanza C., supra*, 165 Cal.App.4th at pp. 1050–1051.) Here, not only did paternal grandmother withdraw her RFA application, but she also stopped visiting D.M. months before the section 366.26 hearing and did not appeal the denial of her placement request. (See *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034–1035 (*Cesar V.*) [relative, although not a party, had standing to appeal denial of her placement request under section 361.3].)

15

Noting we must liberally construe his standing to challenge the court's purported error in failing to consider placement with paternal grandmother, P.J.—mirroring the language in *Esperanza C.*—argues that, even if "unlikely," an alternative permanency plan to adoption remained a "statutory option" for the court. (See *Esperanza C., supra,* 165 Cal.App.4th at p. 1054.) We disagree.

D.M.'s placement with paternal grandmother would not have advanced P.J.'s argument that the relative caregiver exception applied. By the section 366.26 hearing, D.M. was a year and five months old. The only home he ever had known was with Ms. C. He called her " 'mama.' " He visited paternal relatives only bi-weekly until his first birthday in July 2023 when they stopped contacting Ms. C.[5] Even if the court had agreed to place D.M. with paternal grandmother, it then would have "immediately proceeded to the permanency determinations of the section 366.26 hearing." (*A.K., supra*, 12 Cal.App.5th at p. 500 [father who asked the court at the section 366.26 hearing to place child with grandmother had no standing because placement with relative would not advance an argument that his parental rights should not be terminated].) As D.M. would not have developed the type of relationship with paternal grandmother that would have made his removal from her detrimental to his emotional well-being, the relative caregiver exception could not apply. (§ 366.26, subd. (c)(1)(A); see *A.K.*,

---

[5]    In September and October 2023, Ms. C. told DCFS paternal relatives had not contacted her about D.M. since his birthday visit. Nothing in the record indicates they visited between October and the December 2023 section 366.26 hearing.

at p. 500.) There also was no indication that paternal grandmother would have been unwilling to adopt D.M., but willing (and able) to become his legal guardian—another requirement of the relative caregiver exception. (§ 366.26, subd. (c)(1)(A).)

Rather, a hypothetical chain of events would have had to occur to make legal guardianship, rather than termination of parental rights, a possibility: (1) after applying the section 361.3 factors and considering whether paternal grandmother had established and maintained a relationship with D.M.,[6] the juvenile court would have to find it was in D.M.'s best interest to be removed from Ms. C. and placed with paternal grandmother; (2) paternal grandmother would have to resubmit her RFA application to evaluate the home and address paternal grandfather's criminal history; (3) after being placed with paternal grandmother, D.M. would have to form a significant, emotional attachment to her, and she in turn would have to agree to become D.M.'s legal guardian; and (4) at a once again continued section 366.26 hearing, the court would have to apply the relative caretaker exception thereby preserving P.J.'s

_____

[6] In determining whether placement with a relative is appropriate, the child services agency and court must consider a list of eight factors, the first of which is the best interest of the child. (§ 361.3, subd. (a)(1)–(8); *In re J.Y.* (2022) 76 Cal.App.5th 473, 477–478 (*J.Y.*).) After disposition, as was the case here, the child services agency also must consider whether "the relative has established and maintained a relationship with the child." (§ 361.3, subd. (d); *Amber G. v. Superior Court* (2022) 86 Cal.App.5th 465, 491 (*Amber G.*).)

17

parental rights. Such "[s]peculation about a hypothetical situation is not sufficient to support standing." (*In re Cody R.* (2018) 30 Cal.App.5th 381, 390.)

Accordingly, as there is no nonspeculative basis on which P.J. could advance application of the relative caregiver exception if we were to reverse the court's placement decision, he has no standing to challenge that decision on appeal.

## 2. *Section 361.3 was inapplicable*

Even if we were to conclude P.J. has standing, we would find no error as section 361.3 did not apply. The application of a statute to undisputed facts is a question of law that we review de novo. (*In re D.P.* (2023) 92 Cal.App.5th 1282, 1292 (*D.P.*).)

By its terms, section 361.3 "provides for preferential consideration of a relative's request for placement of a child with the relative early in dependency proceedings, before the disposition order." (*J.Y.*, *supra*, 76 Cal.App.5th at p. 477; § 361.3, subd. (a).) If the child's placement must change after disposition, relatives again must be given preference. (§ 361.3, subd. (d) ["[s]ubsequent to [the disposition hearing], whenever a new placement of the child must be made, consideration for placement shall again be given . . . to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements"]; *J.Y.*, at p. 478; see also *Cesar V., supra*, 91 Cal.App.4th at p. 1032 [applying § 361.3 after reunification period where child had to be moved].) Some courts have held the relative preference applies throughout the reunification period even where a new placement is not required. (E.g., *In re Maria Q.* (2018) 28 Cal.App.5th 577, 592 (*Maria Q.*) [appellate courts " 'consistently' " have held " 'that the relative placement preference applies at least through the family

18

reunification period . . . regardless of whether a new placement is required or is otherwise being considered by the dependency court' "]; but see *D.P., supra*, 92 Cal.App.5th at p. 1294 [relative placement preference " 'is applicable after disposition only when a new placement is necessary' "].)  In other words, juvenile courts still "should consider relatives who have come forward [during the reunification period] after an initial placement with a nonrelative." (*Amber G., supra*, 86 Cal.App.5th at p. 491.)

After the reunification period, therefore, the preference no longer applies, absent a need to change the child's placement. In exceptional cases, however, courts have held section 361.3 may apply after the reunification period "where the relative has made a timely request for placement during the reunification period and the child welfare agency has not met its statutory obligations to consider and investigate the relative seeking placement." (*Maria Q., supra*, 28 Cal.App.5th at p. 595; see also, e.g., *In re Isabella G.* (2016) 246 Cal.App.4th 708, 711–712 (*Isabella G.*) [relatives requesting placement were entitled to a hearing under section 361.3 after termination of reunification services where they asked for placement of the child before the disposition hearing, but the agency did not conduct a home assessment and misrepresented the child's placement could not be changed for a year]; *In re R.T.* (2015) 232 Cal.App.4th 1284, 1291–1294, 1299–1301 (*R.T.*) [reversing denial of relative's section 388 petition seeking placement after reunification period where parent identified relatives early in the case, and relatives' home assessments were completed, but the agency and court failed to give relatives preferential consideration earlier in the case].)

None of the above situations was present here. Although paternal relatives first requested placement before disposition, they withdrew their RFA application—thus abandoning their request to be approved for D.M.'s placement—about two months after the disposition hearing and the court's effective termination of the reunification period. There thus was no pending relative placement request made within the reunification period for DCFS or the court to give preferential consideration. And, as D.M. never required a new placement after the disposition—he was bonded with Ms. C. and doing well in her care—section 361.3 did not apply when the paternal grandmother finally asked the court to place D.M. with her at the section 366.26 hearing—more than a year after P.J.'s reunification services had been bypassed.

Nor does the record suggest DCFS or the court failed to comply with its statutory obligations to consider or investigate paternal relatives early in the case so as to give rise to the statute's application. In both *R.T.* and *Isabella G.*, the child services agencies knew of relatives who wanted custody but did not consider them as placement options during the early stages of the case, as required under section 361.3. Here, once P.J. stated paternal relatives were willing to care for D.M., DCFS conducted a pretrial release investigation of the relatives' shared home. DCFS was unable to recommend D.M.'s placement with paternal relatives at that time, however, as paternal grandfather's criminal history required further assessment. DCFS thus gave paternal relatives an RFA application so they could pursue having their home approved for D.M.'s placement and, once completed, promptly submitted it to the RFA division for consideration—all before the jurisdiction and disposition hearings. The approval process ceased only because paternal

relatives voluntarily withdrew the RFA application, not because DCFS shirked its obligation to give them preferential consideration for D.M.'s placement.

P.J. nonetheless argues the preference still applied at the section 366.26 hearing due to the lengthy delay in the paternity testing. He compares the testing delays to the agencies' delays in assessing relatives for placement in *R.T.* and in *Isabella G.* and argues paternal grandmother should have been considered under section 361.3 "once paternity was established." We can't agree. The delays in the paternity testing were due to P.J.'s incarceration, not DCFS's or the juvenile court's conduct, as in *R.T.* or *Isabella G.* P.J.'s place of incarceration had to be included in the testing order, which was not provided to the court until late December 2022. The court issued the order shortly thereafter, in early January 2023. Further delays ensued due to P.J.' s transfer to different facilities—requiring the court to issue a new order with each transfer, which it did—and a backlog in the collection of samples within the prison system.

True, paternal relatives withdrew their RFA application because they wanted DNA confirmation of D.M.'s paternity before engaging in the placement process. Yet, paternal grandmother did not resubmit an RFA application upon learning of the paternity results. Moreover, P.J. had maintained from the beginning that D.M. was his child. It is unfortunate the paternity testing took so long, but even if it had been completed earlier, section 361.3 still would not have applied. P.J. asked for a paternity test only at the end of the disposition hearing, after the court already had bypassed his reunification services. Moreover, the court did not deny P.J. the opportunity to reunify with D.M. because he was an alleged father alone but also due to

21

his four-year prison sentence. As the juvenile court noted, P.J. never was on a path to reunification—whether he was determined to be D.M.'s biological father or not. Indeed, on November 28, 2023, *after* the court declared P.J. to be D.M.'s biological father, the court again found—as it had six months earlier—D.M.'s permanent plan of adoption was appropriate. There is no relative placement preference for adoption, however. (*A.K., supra*, 12 Cal.App.5th at p. 498; see also *In re K.L.* (2016) 248 Cal.App.4th 52, 66 [section 361.3 does not apply where agency "is seeking an adoptive placement for a dependent child for whom the court has selected adoption as the permanent placement goal"].)

We simply cannot construe the situation here as one where relatives asked for placement during the reunification period but were not approved until after its termination. (See, e.g., *Isabella G., supra*, 246 Cal.App.4th at pp. 711–712, 722–723.) Accordingly, under these circumstances, section 361.3 did not apply, and the court therefore did not err in denying the paternal grandmother's and P.J.'s last-minute relative placement request.

## DISPOSITION

The court's December 14, 2023 order is affirmed in its entirety.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

ADAMS, J.